UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANGELA J. BURCH and
DANIEL E. BURCH, her husband,

       Plaintiffs,

v.                                                          Case No. 3:02-cv-556-J-25HTS

UNITED STATES OF AMERICA,

       Defendant.
_____/

## O R D E R

**This cause** was tried before the Court on Counts I and II of the Complaint. Based upon the testimony and evidence received at trial, and the applicable legal standards, the Court makes the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact and Conclusions of Law

Plaintiffs, Mrs. Angela Burch, and her husband, Major Daniel Burch, United States Army, brought this medical malpractice action against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2679, *et. seq.* The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80. Plaintiffs have satisfied all conditions precedent to the bringing of this action, including the requirements set forth in 28 U.S.C. § 2675(a). In the sections below, and after a recitation of preliminary facts, the Court addresses the issues of liability, followed in turn by issues of damages.

In their Complaint, the Burches allege that military physicians at Naval Hospital Jacksonville breached the prevailing standards of care in the treatment they provided to Angela Burch after she presented to them with complaints of pelvic pain. The Complaint alleges that military physicians misdiagnosed Mrs. Burch, negligently executed a surgical procedure based upon the misdiagnosis, negligently managed her post-operative care, and undertook the surgical procedure without her informed consent. Count I of the Complaint sets forth the claims of medical negligence, and Count II is a derivative claim by Major Burch for the injuries suffered by his wife.

## I.   BACKGROUND FACTS AND SUMMARY OF CONCLUSIONS.

At the time of the trial herein, Plaintiff, Angela Burch was 36 years of age, and her husband, Daniel Burch, was 40 years of age and is an officer on active duty in the United States Army. They have two young minor children. As the spouse of an active duty service member, Mrs. Burch's primary health care benefits are provided by the Department of Defense through a network of military clinics and hospitals. These claims against the United States arise from medical care rendered by government employees of this military health care network.

For six years before the surgery herein, Mrs. Burch had been treated for various complaints involving Chronic Pelvic Pain ("CPP"), urinary complaints, and constipation. Initially, Mrs. Burch was seen by her attending internist, Dr. H. Curtis Benson[1], for evaluation of

---

[1]Dr. Benson is a board certified physician in internal medicine. Tr. Vol. 1, p. 205. He has been a physician since 1961. In 1997 he retired from active duty medical service in the United States Navy, and now continues the same practice as a civilian under contract. Tr. Vol. 1, p. 206, 220. He is a special contractor in the military health care network, and has been Mrs. Burch's primary care physician since Major Burch's service with the United States Army brought the Burches to Florida. Dr. Benson first began treating Mrs. Burch on January 20, 2000, well before the TAH/BSO surgical procedure that is at the center of this case. Tr. Vol. 1, p. 206. As such,

various symptoms which included pelvic pain.  Dr. Benson suspecting endometriosis, referred

Mrs. Burch to Navy Hospital Jacksonville's gynecology department for further evaluation.

Because gynecologists typically act as primary care physicians for women, symptoms

associated with female pelvic pain often result in gynecologic referrals by other physicians.  Tr.

Vol. 1, p. 92.  However, the list of potential causes - or the "differential diagnosis" - of female

pelvic pain involves a number of different medical specialty areas, and requires a multi-

disciplinary approach.  Tr. Vol. 1, pp. 95-98.

Both Plaintiff and Defendant agree that the differential diagnosis of Mrs. Burch's pelvic

pain included both urologic causes as well as gynecologic causes.  As Mrs. Burch progressed

through the diagnostic process, including a referral to a urologist, the medical information that

was developed made a potential case for both a urologic and gynecologic cause for her

symptoms.  Mrs. Burch's urologist, Dr. J. M. Fitzgerald, diagnosed Mrs. Burch with a urologic

disease called interstitial cystitis. Interstitial cystitis occurs in the bladder, and would not lead to a

recommendation for a TAH/BSO surgery.  Dr. Margaret Larkins-Pettigrew[2], a doctor in the

gynecology department, told Mrs. Burch that she had been diagnosed with a severe case of a

gynecologic disease called endometriosis; endometriosis can be treatable by way of the surgical

removal of the uterus and ovaries (the "TAH/BSO" surgery).[3]  This endometriosis diagnosis, and

Dr. Benson has been in the best position to assess the "before and after" changes in Mrs. Burch's
health.

[2]Dr. Larkins-Pettigrew is an obstetrician-gynecologist who previously treated Mrs. Burch
at Navy Hospital Jacksonville.

[3] The abbreviations "TAH/BSO" which appear throughout the medical records stand for
"Total Abdominal Hysterectomy" (the removal of the cervix and uterus) and "Bilateral Salpingo

the work-up to it, were flawed.  The surgery was in fact contraindicated, and unnecessarily exposed Mrs. Burch to the known risks and hazards of surgery.

The Court concludes that breaches of the prevailing professional standards of medical care proximately caused permanent injury to Angela Burch and the Burches are entitled to a judgment of damages more specifically described below.  The Court rejects the conclusion, however, that the pain which manifested itself after the surgery was due to any breach of care during the surgery or the post-surgery care of Mrs. Burch.  That is, the misdiagnosis led to the wrongful TAH/BSO procedure, which caused permanent injury in that Mrs. Burch unnecessarily lost a part of herself forever in that procedure.  But the Plaintiff failed to prove that the surgery, while wrongful, was also performed below the proper standard of care.

## II.   THE EVIDENCE PRESENTED AT TRIAL.

Mrs. Burch first presented to her internist, Dr. Benson, on January 20, 2000 with symptoms that included abdominal pain and gastric discomfort.  Tr. Vol. 1, p. 207.  Dr. Benson began a diagnostic work-up.  Tr. Vol. 3, p. 149.  By April 3, 2000, Dr. Benson had completed a good deal of Mrs. Burch's diagnostic work-up (Tr. Vol. 1, p. 208); on that date, Dr. Benson referred Mrs. Burch to the obstetrics/gynecology department at Naval Hospital Jacksonville "so that they could pick up the ball and rule in or rule out endometriosis."  Tr. Vol. 1, p. 208.

As a great deal of the expert testimony at trial centered on two different diseases as potential explanations of Mrs. Burch's pelvic pain -- and in turn, the reasonableness of the medical care provided -- these two diseases are described, as follows:

---

Oophorectomy" ( the removal of the tubes and ovaries.)  The Court will refer to this surgery as the "TAH/BSO  procedure."

Interstitial Cystitis is a urologic disease of the tissue which lines the inside of the bladder. When this condition is present, the sensitive mucosal tissue on the inside of the bladder loses its resiliency. When the tissue undergoes the normal expansion and contraction associated with the filing and emptying of the bladder, the tissue tears in a diffuse and widespread pattern (i.e., "interstitially.") The tearing causes pinpoint hemorrhages called glomerulations. Tr. Vol. 1, p. 102. The painful discomfort associated with this condition results from the same types of pinpoint tearing of the nerves which enervate the bladder wall.

Patients with interstitial cystitis often present with symptoms which mimic a common urinary tract infection. However, when urine cultures are taken and analyzed, the bladder is found to be free of infection. Thus, the classical presentation of suspected interstitial cystitis is bladder pain in the absence of urinary tract infection. Tr. Vol. 1, p. 100-101. This specific symptom is documented in Mrs. Burch's medical records by her gynecologist as early as May 18, 2000. App. 5 ("Indications: . . . The patient now has severe bladder pain with no evidence of urinary tract infection." ) Activities which cause the bladder to stretch or move can result in a painful aggravation of symptoms. These activities can include sexual intercourse and also bowel function.

Endometriosis is a gynecologic disease related to the special tissue that normally lines the inside of a woman's uterus. The inside lining of the uterus - called the endometrium - is normally lined with this special tissue, itself called endometrial tissue. The tissue is unique because of its physiological response to hormone levels associated with the monthly cycle of fertility. At the beginning stages of this cycle, hormones (released by the ovaries) cause the endometrial tissue to proliferate and coat the interior lining of the uterus in anticipation of a fertilized egg. If

5

conception does not occur in a particular cycle of fertility, different hormones are released which cause the endometrial tissue to dissolve and fall away, triggering the period of menses. Tr. Vol. 1, p. 118.

For reasons that are not entirely understood, sometimes this endometrial tissue migrates outside of the uterus and into the abdomen. When the tissue is found in anatomical areas outside of the uterus, it is called endometriosis, and is usually observable in the form of visible lesions. The tissue is presumed to respond to hormone levels in the same manner as the endometrium. Often, but not always, the condition may be associated with abnormal pain which occurs most severely during periods of menses. There is no direct relationship between the degree of pain and the degree of endometriosis. Tr. Vol. 3, p. 154. Thus, pain alone is not diagnostic for endometriosis.

The first military gynecologist to see Mrs. Burch was Dr. Rincon on April 3, 2000. Based upon her symptoms, Dr. Rincon proposed a trial of a drug therapy called "Depo-Lupron." Tr. Vol. 1, p. 62. Depo-Lupron is a drug treatment which, over a period time, slowly stops the hormone function of the ovaries, essentially resulting in the chemical onset of menopause. *Id.* Because this is the same hormone function to which endometrial tissue responds, Depo-Lupron can have both diagnostic as well as therapeutic value to a patient with suspected endometriosis. Dr. Harrison Wade Barnes, Jr.[4] testified that in his own practice, four months was the minimum length of time for a diagnostic trial of Depo-Lupron. Tr. Vol. 3, p. 182. Plaintiff's expert Dr.

---

[4]Dr. Barnes received his medical degree in 1975, and became board certified in obstetrics and gynecology in1980. For the last twenty-five years he has practiced obstetrics and gynecology in Jacksonville, Florida. Tr. Vol. 3, p. 142-43. He testified at trial as a specially retained expert witness as contemplated by Rule 26. He was retained by the United States.

Alexander Rosin[5] testified that the prevailing literature favors a period of at least six months. Tr. Vol. 1, p. 64. Whether four months or six, there is no dispute that Mrs. Burch's diagnostic trial of Depo-Lupron was never completed, having received no more than two and one half months of Depo-Lupron therapy prior to the TAH/BSO procedure at issue, and even less time (six weeks) prior to the recommendation to conduct the TAH/BSO procedure. Tr. Vol. 3, pp. 182-83.

Dr. Rincon transferred Mrs. Burch's care to another staff gynecologist, Dr. Larkins-Pettigrew. Dr. Larkins-Pettigrew conducted two surgical procedures on Mrs. Burch, including the June 12, 2000 TAH/BSO procedure which is at issue in this case.

The first surgical procedure, on May 18, 2000, consisted of three types of diagnostic visual examinations: 1) cystoscopy, or the visual examination of the inside of the bladder using an optical instrument; 2) proctoscopy, or the visual examination of the inside of the bowels using an optical instrument; and 3) laparoscopy, which in this case was the visual examination of the abdomen using an optical instrument. App. 5.

The results of the May 18, 2000 diagnostic surgery were:

> a) cystoscopy: Dr. Larkins-Pettigrew visually observed the *inside wall* of the bladder and saw abnormal tissue which she believed were *possible* lesions of endometriosis. Tr. Vol. 3, p. 32 (Dr. Larkins-Pettigrew: "could be endometriosis"); Tr. Vol. 3, p. 33 (Dr. Pettigrew: "might have endometriosis") During this procedure, no biopsy sample was taken in order to confirm by

---

[5]Dr. Rosin is a board certified gynecologist and obstetrical surgeon who has practiced medicine for a period of more than forty (40) years. He has had experience both as a military physician and an emergency room surgeon. According to hospital records, he has performed more than 10,850 live birth deliveries since establishing his gynecologic practice in Jacksonville, Florida in 1969. Tr. Vol. 1, p. 58. In his obstetric and gynecologic practice, he concentrated in the areas of fertility and endometriosis. Tr. Vol. 1, p. 34. Dr. Rosin was one of the founding members of the American College of Emergency Room Physicians. Tr. Vol. 1, p. 56. He testified at trial as a specially retained expert witness as contemplated by Rule 26. He was retained by Major and Mrs. Burch.

pathology whether the tissue was or was not actually endometriosis;

     b) proctoscopy: Dr. Larkins-Pettigrew visually observed the inside of the lower portion of the large bowel, and found nothing abnormal;

     c) laparoscopy: Dr. Larkins-Pettigrew visually observed the pelvic area of the abdomen and found it free of any evidence of endometriosis, and found the upper part of her abdomen was "actually clean" and free of any visible disease. Tr. Vol. 3, p. 32. Dr. Larkins-Pettigrew also saw "some bowel adhesions." *Id.*

Of importance for the May 18, 2000 procedure, there was no finding of a suspicion of endometriosis associated with any anatomy *other than the inside of the bladder*. App. 5.

It was undisputed in the medical testimony at trial that a finding of endometriosis on the inside the bladder –but not  in the abdomen, where it most often occurs – would be a highly unusual finding. Dr. Rosin stated that he had "never seen it in my lifetime." Tr. Vol. 1, p. 86. Shortly after performing the diagnostic cystoscopy and photographing the abnormal tissue on the inside of Mrs. Burch's bladder, Dr. Larkins-Pettigrew took the photographs to a trained urologist, Dr. J. M. Fitzgerald.  Dr. Larkins-Pettigrew admitted that after Dr. Fitzgerald evaluated the photographs, he did not believe the abnormalities in the bladder tissue raised suspicions of endometriosis. Tr. Vol. 3, pp. 98-104. As indicated by his own medical records, Dr. Fitzgerald believed that the abnormalities were "bladder mucosal hyperemia and hemorrhage," which are markers for interstitial cystitis. The government's expert witness,  Dr. Barnes, agreed that this was the posture of Mrs. Burch's differential diagnosis at this point in time.  Tr. Vol. 3, pp. 178. After the May 18, 2000 procedure by Dr. Larkins-Pettigrew, an appointment was arranged for Mrs. Burch to see the urologist, Dr. Fitzgerald.  On that May 26, 2000 visit, Dr. Fitzgerald's office note indicates that he is suspicious of interstitial cystitis as the most logical explanation of Mrs. Burch's pelvic pain symptoms. App. 30.

At this point in Mrs. Burch's diagnostic work-up, a complete laparoscopic (visual) examination of Mrs. Burch's abdomen had been completed, and not a single lesion suggestive of endometriosis had been identified anywhere. Although one notation in the medical record indicates that Mrs. Burch experienced some diminution of pelvic pain after the Depo-Lupron therapy began, Dr. Barnes admitted that this could just as likely have been from the known therapeutic impact which Depo-Lupron has on a condition called irritable bowel syndrome, a condition from which Mrs. Burch already suffered. Tr. Vol. 3, p. 182-83. This result, then, could not be relied upon to justify a diagnosis of endometriosis. *Id.* No medical evidence corroborative of endometriosis was ever found.

In documenting her findings in Mrs. Burch's medical record, Dr. Larkins-Pettigrew attempted to describe the results of the May 18, 2000 diagnostic procedure in a dictated operative report. App. 5.

A fair reading of the operative report suggests to a reader, including the *defense* expert, that Dr. Larkins-Pettigrew had observed visible lesions of endometriosis in Mrs. Burch's *abdomen*, when in fact she had not. Dr. Wade Barnes, who testified on behalf of the United States, admitted that he had erroneously presumed this to be the diagnostic finding. Tr. Vol. 3, pp. 192-93. Dr. Barnes admitted that it was only after hearing Dr. Larkins-Pettigrew's oral testimony at trial that he understood Mrs. Burch's abdomen to be free of any visible lesions of endometriosis. Tr. Vol. 3, pp. 192-93. Additionally, Dr. Fitzgerald's report indicates he believed Dr. Larkins-Pettigrew's laparoscopy indicated Plaintiff had "significant endometriosis" independent of the bladder "abnormalities." App. 32. Dr. Barnes also admitted to not having reviewed the photographs taken during the diagnostic laparoscopy prior to formulating his

9

opinions on the standard of care. Tr. Vol. 3, p. 187.   Those photographs depict Mrs. Burch's uterus, ovaries, and fallopian tubes, and show them to be healthy organs and free of endometrial lesions and adhesions. Tr. Vol. 1, pp. 69-77, 81-84.

Immediately following the May 18, 2000 diagnostic laparoscopy / cystoscopy, and while Mrs. Burch was still in the recovery room, Dr. Larkins-Pettigrew told Major Burch that his wife had severe endometriosis and a complete hysterectomy with removal of the ovaries (oopherectomy) would be necessary. Tr. Vol. 2, pp. 59-60. The subsequent medical records prepared by Dr. Larkins-Pettigrew describe "severe endometriosis" as a pre-surgical diagnosis. These include the history and physical examination records which Dr. Larkins-Pettigrew created in preparation of the TAH/BSO procedure. These records twice refer to "severe endometriosis." App. 6.

On May 30, 2000, Dr. Larkins-Pettigrew saw Mrs. Burch for the first time following the May 18, 2000 diagnostic laparoscopy, and for the last time prior to the June 12, 2000 TAH/BSO procedure. The purpose of the appointment was to conduct Mrs. Burch's pre-operative visit, at which time a medical record called the "Pre-operative History and Physical Report" is completed with the patient. Tr. Vol. 3, pp. 111-12.   In Mrs. Burch's Pre-operative History and Physical Report, Dr. Larkins-Pettigrew describes Mrs. Burch as a "32 year old with LMP (last menstrual period) of April 9[th] with severe endometriosis " and as having a "Hx [history] of severe endometriosis." App. 6.

Although Dr. Larkins-Pettigrew contended at trial that she had only "suspected"

endometriosis,[6] this new characterization is inconsistent with the medical records.  From her trial testimony:

> Q.   Okay. So this is her first visit with you after your laparoscopy and cystoscopy?
>
> A.   Yes.
>
> Q.   All right. So you tell her that she has a history of severe endometriosis, that just wasn't true, was it, on May 30[th] she did not have a history of severe endometriosis at all?
>
> A.   She had a history of *suspected* severe endometriosis, which is the same thing. . . .

Tr. 3, p. 112.

The medical records are also consistent with Major Burch and Mrs. Burch being told that the severe endometriosis was in the abdomen, when in fact it was not.  Tr. Vol. 2, p. 59.  At one point in the  "Pre-operative History and Physical Report," Dr. Larkins-Pettigrew even described Mrs. Burch's endometriosis as being "Stage IV."  Dr. Barnes, testifying on behalf of the United States, admitted that a fair reading of such a notation by another gynecologist would indicate a reference to the endometriosis staging criteria established by the American Fertility Society. Tr. Vol. 3, pp. 111-12. Using that criteria, a standardized matrix is established under which various findings of visible lesions of endometriosis in the abdomen are assigned a numerical score.  The scoring values are based upon location, size, and depth of the lesions in the abdomen. To

---

[6]See the sections labeled "Pre-operative Diagnosis" and  "Indications" in Dr. Larkins-Pettigrew's operative note describing the June 12, 2000 TAH/BSO procedure. App. 33.  This report was dictated on June 22, 2000, ten days after the surgery, and after the results of Mrs. Burch's pathology had shown her reproductive organs and bladder to be free of any endometriosis.

establish a scoring description of "Stage IV" or "severe endometriosis," (requiring at least 40 scoring points on the matrix,) extensive and widespread lesions would have been present on most all of Mrs. Burch's reproductive organs. Tr. Vol. 1, pp. 85-88.  However, in Mrs. Burch's case, no abdominal lesions were observed at all.  *Id.*

Endometrial lesions on the inside of the bladder are so uncommon that the American Fertility Society does not even establish a scoring category in the  matrix for this finding.  Even accounting for Dr. Larkins-Pettigrew's erroneous belief that she had seen endometrial lesions on the inside of the bladder, had Dr. Larkins-Pettigrew's findings been accurately applied to the staging matrix, Mrs. Burch's staging score would have been zero. Tr. Vol. 3, p. 119.  Dr. Larkins-Pettigrew admitted that Mrs. Burch "absolutely knew that we were going on a working diagnosis of severe endometriosis" at the time of the TAH/BSO procedure.  Tr. Vol. 3, p 49. At this point in Mrs. Burch's care, a reasonably careful and prudent surgeon would not have undertaken abdominal surgery to remove reproductive organs that did not show the slightest evidence of disease. Tr. Vol. 1, p. 93.

Within a short period following the May 18, 2000 diagnostic surgery, Dr. Larkins-Pettigrew scheduled a TAH/BSO surgical procedure for Mrs. Burch.[7]  This was done 1) without waiting for Mrs. Burch's trial of Depo-Lupron being completed; and 2) without waiting for Mrs. Burch's diagnostic work-up for interstitial cystitis to be completed.

When the urologist, Dr. Fitzgerald, first saw Mrs. Burch, he noted that a hysterectomy had already been scheduled for June 12, 2000. Dr. Fitzgerald scheduled another cystoscopy

---

[7]The surgical date had already been scheduled by the time of Mrs. Burch's May 26, 2000 office visit with Dr. Fitzgerald.  App. 30.

(insertion of a cystoscope to visualize the inside of the bladder). Because it is done under general anesthesia, this second cystoscopy would be performed immediately prior to the scheduled TAH/BSO procedure on June 12, 2000. This would also be the first time that a trained urologist would examine the suspicious tissue on the inside of Mrs. Burch's bladder. To confirm his working diagnosis of interstitial cystitis, the urologist's cystoscopy examination would also include taking an appropriate biopsy sample for pathologic analysis of the suspected tissue inside the bladder. App. 30.

On June 12, 2000, Mrs. Burch was taken to the operating room at Navy Hospital Jacksonville under general anesthesia. The urologist, Dr. Fitzgerald, began the cystoscopy at 4:05 p.m. and concluded at 4:28 p.m. The urologist's examination found that the abnormal tissue was *not* endometriosis, and a biopsy sample was taken for pathological confirmation. App. 32. Following this finding, and instead of canceling the planned TAH/BSO surgical procedure, Dr. Larkins-Pettigrew removed Mrs. Burch's reproductive organs while Mrs. Burch remained under general anesthesia. App. 33. Dr. Larkins-Pettigrew's operative report makes no mention of finding any evidence of endometriosis. *Id.* She removed Mrs. Burch's healthy uterus, ovaries, and fallopian tubes. These organs, along with the bladder biopsy sample, were sent to the pathology lab for analysis by a pathologist. No endometriosis was ever documented pathologically on any of the tissue. App. 35. No adhesions were ever documented on any of the tissue. *Id.* The pathology report of Mrs. Burch's reproductive organs shows them to be perfectly normal and healthy. *Id.*

Dr. Wade Barnes, testifying on cross-examination in the United States' case in chief, admitted that it would be a breach of the prevailing standards of care "for the gynecologist to be

going down one road at the Naval Hospital Jacksonville and the urologist [to] be going down a different road at Naval Hospital Jacksonville." Tr. Vol. 3, p. 177-78.   This lack of coordination contributed to Mrs. Burch  undergoing this  unnecessary and unjustified surgery.

At trial, Dr. Larkins-Pettigrew testified that she knew nothing of the urologist's suspicion of interstitial cystitis as the cause of Mrs. Burch's pelvic pain.  In defending her decision to proceed with the ill fated TAH/BSO procedure, Dr. Larkins-Pettigrew stated that even at the time of surgery she was still unaware of the urologist's working diagnosis of interstitial cystitis, and stated she had not been told that the urologist suspected interstitial cystitis when she began the surgery. Tr. Vol. 3, pp. 123-24 (Dr. Larkins-Pettigrew: "Never during the entire process of my treating her and Dr. Fitzgerald's involvement did he ever mention to me the diagnosis of interstitial cystitis. . . . he never verbalized that to me, and he was – and he was the consultant and the expert in her – in bladder function and bladder disease."); *see also* Tr. Vol. 3, pp. 103, ln. 15 (Dr. Larkins-Pettigrew: "No, I would say that [Dr. Fitzgerald] probably suspected once he did a cystoscopy that it might be interstitial cystitis, but that was never conveyed to me.");*see also* Tr. Vol. 3, pp. 103, ln. 3 (Dr. Larkins-Pettigrew: "Which is not what he ever told me that he thought she had interstitial cystitis.")

Dr. Fitzgerald's operative note, dictated the day of the diagnostic cystoscopy is straightforward.  App. 32.  As to the purpose of the urologist's procedures, Dr. Fitzgerald states: "OPERATIVE DIAGNOSIS: RULE OUT INTERSTITIAL CYSTITIS . . . INDICATIONS: . . . [Mrs. Burch] underwent *laparoscopy* by Dr. Larkins-Pettigrew which was notable for significant endometriosis and at the time of *laparoscopy* Dr. Larkins-Pettigrew performed a *cystoscopy* and saw evidence of abnormalities of the bladder. . . . She now presents to the operating room to treat

14

her endometriosis and at the same setting I will perform a cystoscopy under anesthesia . . . ." *Id.*

Presumably, Dr. Fitzgerald would have read the operative report describing the results of the May 18, 2000 diagnostic procedures, and come to the erroneous conclusion that severe endometriosis had been visualized in Mrs. Burch's abdomen, when in fact it had not. What Dr. Fitzgerald did not know was that the *only* suggestion of endometriosis was none other than the same "abnormalities of the bladder" that he was preparing to evaluate. Although Dr. Larkins-Pettigrew may have believed her testimony was exculpatory as to whether she herself breached the prevailing standard of care, her testimony was conclusive as to the liability of the *Defendant*, who answers for the negligent conduct of all of its military physicians. For the "gynecologist to be going down one road at the Naval Hospital Jacksonville and the urologist [to] be going down a different road at Naval Hospital Jacksonville" was indeed a breach of the prevailing standards of care. Tr. Vol. 3, pp. 177-78.   Moreover, it unnecessarily resulted in profound harm to Mrs. Burch. At this point in her care, Mrs. Burch, at age 32, had needlessly lost all of her reproductive organs and faced the onset of premature menopause.

Mrs. Burch's medical care rendered at Navy Hospital Jacksonville was reviewed by Dr. Rosin. Dr. Rosin described what the prevailing standard of care should have dictated in Mrs. Burch's case. His testimony was persuasive regarding the misdiagnosis.

First, upon the referral of Mrs. Burch to the gynecology department, an accurate medical history of Mrs. Burch should have been taken, including a review of her prior medical records. Next, an analysis would have been done to evaluate the risk factors for all six categories of the causes for chronic pelvic pain. There is no evidence in Mrs. Burch's record that this was ever done, despite Dr. Larkins-Pettigrew making a specific notation that Mrs. Burch experienced

bladder pain without any evidence of a urinary tract infection.

The next logical step, if deemed necessary, would have been to conduct the diagnostic laparoscopic procedure which was performed on May 18, 2000. That procedure disclosed the absence of any lesions of endometriosis in Mrs. Burch's abdomen. In fact, the May 18, 2000 laparoscopy photographs disclosed the absence of any visible disease process in her abdomen whatsoever. A cystoscopy, however, did disclose visibly abnormal tissue on the inside of Mrs. Burch's bladder.

At this point, two significant findings would have caused a prudent physician to refer Mrs. Burch to a urologist for evaluation of interstitial cystitis: 1) bladder pain in the absence of infection, and 2) visibly abnormal tissue on the inside of the bladder. These medical facts alone are highly suggestive of interstitial cystitis, were a reasonable explanation for Mrs. Burch's symptoms, and prudence would have dictated an opportunity for this probable explanation of Mrs. Burch's pelvic pain to be evaluated.

A urological referral in fact occurred – but it was premised on Dr. Larkins-Pettigrew's suspicion of endometriosis in the bladder. Tr. Vol. 3, pp. 101-102. Dr. Larkins-Pettigrew's erroneous determination that the abnormal tissues seen in Mrs. Burch's bladder were lesions of endometriosis was not a well reasoned one. First, such a presentation itself would have been extraordinarily rare. Secondly, if Mrs. Burch had actually had severe endometriosis inside her bladder, one would expect there to have been evidence of blood in her urine during the approximate times of her menses. (The endometrial tissue inside the bladder would behave in the same manner as the endometrial tissue lining the uterus.) Tr. Vol. 1, pp. 100-101. This never was found either.

16

The United States' suggestion that perhaps Mrs. Burch still might have had endometriosis, but that her Depo-Lupron treatment had caused it to "disappear" to the naked eye and no longer be observable, is a suggestion that is not consistent with the pathology reports from the June 12, 2000 TAH/BSO procedure which microscopically failed to identify *any* endometriosis. The examination of Mrs. Burch's removed uterus found that the endometrial tissue there was still in the "proliferative" phase, or a phase where it is still accumulating in anticipation of a possibly fertilized egg. If the Depo-Lupron therapy, which had been underway for less than two and one-half months, had really had such a dramatic impact on the endometrial tissue located in other areas of Mrs. Burch's body, the same results would have been observable in the endometrial tissue found in Mrs. Burch's uterus. Tr. Vol. 1, pp. 114-15; 118-20. The medical evidence is persuasive that Mrs. Burch's "invisible endometriosis" was invisible because it did not exist.

The "invisible endometriosis" argument advanced by the United States also discloses another serious inconsistency: if Mrs. Burch's gynecologist really believed that the recently instituted Depo-Lupron therapy was so effective in causing her endometriosis to disappear, then the prudent course of conduct would have been to allow this non-surgical therapy an opportunity to continue, thereby resolving her symptoms of endometriosis. Dr. Larkins-Pettigrew admitted that Mrs. Burch had indicated a willingness to continue on the Depo-Lupron therapy. Tr. Vol. 3, p. 29. The Depo-Lupron therapy was the chemical equivalent of removing Mrs. Burch's ovaries without the risks of surgery, and also had the benefit of being reversible. Tr. Vol. 1, p. 153. The latter benefit was a significant consideration in the care of a 32 year old woman still of child-bearing age.

17

The conduct of a total abdominal hysterectomy (removal of the uterus) with a concurrent bilateral salpingo-oopherectomy (removal of the ovaries) under general anesthesia is a serious undertaking. The inherent risks of the procedure include nerve injury, infection, paralysis, and death. Proposing such a serious surgical procedure on a 32 year old mother of two young children, solely on the remote speculation that it could "cure" the symptoms of unverified endometriosis, was a grossly improvident undertaking. A careful and prudent gynecologic surgeon would have at least permitted the urologist's diagnostic work-up for interstitial cystitis to have been completed. Tr. Vol. 1, pp. 103. Unfortunately for Mrs. Burch, this was not done. Although the physicians at Navy Hospital Jacksonville had Mrs. Burch's consent to undergo the TAH/BSO procedure on June 12, 2000, they did not have her *informed* consent. Mrs. Burch's consent could hardly be characterized as "informed" when her own physicians were hopelessly uninformed of each other's findings. The most compelling testimony on this issue is that which is spoken from the pages of medical records created by the United States.

Further, informed consent is not achieved by having a patient sign a boilerplate recitation that surgical procedures can sometimes result in misfortune. The patient must also be informed of the available alternatives to proposed procedure. *See* Fla. Stan. Jury Instr. 4.2b—Medical Negligence (informed consent). If Mrs. Burch had been aware that no physician had ever seen the first lesion of endometriosis anywhere in her body, it is not reasonable to assume that this 32 year mother of two young children would have submitted herself to the inherent risks associated with a major surgical procedure. The decision of *Gassman v. United States,* 589 F.Supp. 1534 (M.D. Fla. 1984) is directly on point (Federal Tort Claim Act applying Florida law of informed consent, where neurological complications are not mentioned). *Id.* at 1547. Similarly, the

Defendant's "Consent Note" fails to disclose the risk of neurologic injury nor does it disclose a single alternative to surgery for Mrs. Burch's consideration in deciding whether to consent. App. 39.

Dr. Larkins-Pettigrew admits that "[a] prudent physician, any obstetrician/gynecologist would not even [have] addressed [TAH/BSO] surgery with someone who still wants children." Tr. Vol. 3, p. 131. Despite the absence of medical records reflecting that Dr. Larkins-Pettigrew discussed that concern with Mrs. Burch, the Court is persuaded by Dr. Larkins-Pettigrew's testimony that this conversation took place. Nevertheless, it was a conversation seeking 'informed' consent for a procedure predicated on a gross misdiagnosis, and therefore was not 'informed' consent at all.   Mrs. Burch and Major Burch both testified that they would have liked to have had more children. Tr. Vol. 2, p. 48.  There is no discussion of any non-surgical alternatives to the TAH/BSO procedure found in any of the records, nor is there any discussion of continuing with the procedure on the basis of "adhesions." Tr. Vol. 1, p. 88.  There is no credible evidence that Mrs. Burch ever had any significant adhesive disease, none being evident in the laparoscopy photos, App. 40, Tr. Vol. 1, p. 82, and none found on pathology, App. 35. Even if there was adhesive disease, there was no persuasive testimony that adhesive disease would be properly treated by the TAH/BSO procedure.  Therefore, the Court rejects Dr. Larkins-Pettigrew's suggestion that the Plaintiff wanted to proceed with the TAH/BSO procedure regardless of endometriosis simply to treat adhesive disease.  In sum, Plaintiff was permanently injured due to Dr. Larkins-Pettigrew's misdiagnosis and the TAH/BSO procedure which was conducted without Plaintiff's *informed* consent.

On the other hand, the greater weight of the evidence does not support the conclusion that

19

Mrs. Burch's post-surgical management also did not meet the standard of care. Dr. Barnes testified that he thought the "actual surgery itself" was "performed proficiently." Plaintiff's expert Dr. Rosin testified regarding what he perceived to be breaches of both pre- and post-surgical care, and it was upon his testimony that Plaintiff staked her case regarding both the misdiagnosis and the surgical complications.[8] Whereas the Court found his testimony regarding the endometriosis misdiagnosis compelling, the Court concludes that Dr. Rosin was less persuasive regarding the alleged surgical and post-surgical complications. He is not a neurologist, and Plaintiff's theory depends on nerve damage as a result of an allegedly undiagnosed hematoma following the TAH/BSO procedure.

The Government's defense of this issue relied on the testimony of neurologist Dr. Albin Mororaiu.[9] He testified that causation had not been established because there was no "clear cut evidence of specific nerve damage in this patient," and that it was only a "theory" that some nerves might have been damaged. Tr. Vol. 4, pp. 10-11. His testimony was persuasive and, at least as importantly, his was the only testimony on the question of neurological injury that was properly before the Court.

In short, Plaintiff's theory of liability as to the post-surgical pain and complications relied on a doctor not competent to testify as to that issue. Alternatively, Plaintiff invites the Court to

---

[8]Dr. Rosin testified that had Mrs. Burch's pre-surgical antibiotics been administered within the standard of care (i.e. timely), more likely than not she would not have ever developed a post-surgical infection which ultimately led to her abdominal wall atrophy and neurologic injury. Tr. Vol. 1, p. 40-41, p. 129-130, 137-138.

[9]Dr. Mororaiu is a board-certified neurologist. He has been practicing neurology in Delray Beach, Florida since 1982. Tr. Vol. 4, pp. 4-7. He testified at trial as a specially retained expert witness as contemplated by Rule 26. He was retained by the United States.

20

conclude that the only cause for the amplitude in pain Mrs. Burch experienced following the surgery was the surgery itself.[10]  The Court cannot accept that invitation.  In this case, there is no doubt that Mrs. Burch had pain before the surgery and had worse pain after the surgery occurred. But whether that pain is neurological, or psychosomatic, or the same pain (but amplified) from before the surgery, the Court does not know.  It may be that the chronic pelvic pain which caused Dr. Larkins-Pettigrew to wrongly remove Plaintiff's reproductive organs has simply gotten worse, and has nothing to do with the surgery.  That theory is at least as persuasive as Plaintiff's theory, particularly when noting that the pain which caused the misdiagnosis and TAH/BSO procedure has apparently never been treated successfully.

## III.  THE LEGAL STANDARDS APPLICABLE TO THE CAUSE OF ACTION

The Florida law of medical negligence is succinctly summarized by standard jury instructions approved by the Florida Supreme Court.

**Fla. Stan. Jury Instr. 4.2a—Medical Negligence**

> Negligence is the failure to use reasonable care.  Reasonable care on the part of a [physician][hospital][health care provider] is that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably careful [physicians][hospitals][health care providers].

**Fla. Stan. Jury Instr. 4.2b—Medical Negligence (informed consent)**

> Negligence is the failure to use reasonable care.  Reasonable care on the part of a physician in obtaining the informed consent to treatment of a patient consists of providing the patient information sufficient to give a reasonable person a general understanding of the proposed treatment or procedure, of any medically

---

[10]The best example of that invitation can be found in Plaintiff's Proposed Findings of Fact and Conclusions of Law.  In criticizing the testimony of Dr. Mororaiu, Plaintiff notes that Dr. Mororaiu "could not advance any plausible alternative explanation for Mrs. Burch's symptoms."  This 'res ipsa'-type argument shifts the burden of proof to Defendant.

> acceptable alternative treatments or procedures, and of the substantial risks and
> hazards inherent in the proposed treatment or procedure which are recognized by
> other physicians in the same or a similar community who perform similar
> treatments or procedures.

Florida courts have held that "[t]he duty to diagnose a condition correctly does not make the physician an insurer of the accuracy of the diagnosis. However, if an incorrect diagnosis is a result of a breach of the standard of care, the physician is subject to civil liability." Florida Torts, Liability of Health Care Providers, § 61.22(1)(a)(I), citing, *Gentry v. Dep't of Prof'l and Occupational Regulations, St. Bd. of M. E.*, 293 So. 2d 95, 97 (Fla. 1st DCA 1974). In *R.J. v. Humana of Fla., Inc.*, 652 So. 2d 360 (Fla. 1995), the Florida Supreme Court held that negligent misdiagnosis that results in subsequent inappropriate and harmful medical treatment can be the legal cause of injury. In that case, a young man was given a false positive diagnosis for HIV and was treated for that condition until another HIV blood test was administered approximately one and a half years later. The plaintiff alleged bodily injury from resulting emotional harm based on the misdiagnosis. The court clearly viewed the misdiagnosis as the cause in fact of the emotional injuries. The court also implicitly stated that the misdiagnosis was the proximate cause of the injuries by stating the following:

> If R.J. can establish that the misdiagnosis in this case led to invasive medical
> treatment or prescriptions of caustic medication...and that he suffered bodily
> injury from that treatment, then he would have met the requirements of the impact
> rule and would be able to recover for the emotional trauma suffered as a result of
> that treatment."

*Id.* at 364. If anything, the facts of the instant case are more troubling that the facts of *R.J.*

Where caused by a breach of the prevailing standard of care, a claimant may recover damages for pain and suffering, disability or physical impairment, disfigurement, mental anguish,

22

inconvenience, loss of the capacity for the enjoyment of life, medical expenses, and lost earnings. The spouse of a primary claimant may recover for loss of consortium and services. The damages apply both to the past as well as in the future. *Florida Standard Jury Instruction 6.2*

## IV.  CONCLUSION

This Court finds that Plaintiffs have met their burden of proof with regard to both negligence and causation.  This Court is persuaded that, more likely than not, Mrs. Burch was misdiagnosed and her consent was not "informed" as a result of such misdiagnosis  Although it is true that some measure of pain brought Mrs. Burch to the physicians at Navy Hospital Jacksonville, that pain may have been successfully resolved with an accurate diagnosis.  The crippling pain which now defines Mrs. Burch's life cannot be compared to the discomfort she felt before surgery.

## V.  DAMAGES

Having found that the government physicians breached the prevailing standards of care which proximately caused the injury to Angela Burch and Major Daniel Burch, the Court makes the following findings with respect to damages.

The Court saw evidence contrasting Mrs. Burch's health and appearance both before and after the unjustified surgery. The changes are dramatic and saddening.  Angela Burch was a high school All American in basketball and track.  She was athletic, and exuded energy.  She came from a farm family of nine siblings and cooked for the entire family. Tr. Vol. 2, p. 42.  After her marriage to Major Burch, she managed a bed and breakfast establishment by herself, cooking for the guests, performing all of the cleaning and maintenance tasks, even cutting the grass. Tr. Vol. 2, p. 53.  She cooked meals for the bachelor Lieutenants who served with Major Burch in the

Army. Tr. Vol. 2, p. 51. She and her husband played recreational basketball and ran together. Tr. Vol. 2, p. 47. She was romantic. Tr. Vol. 2, p. 52. In the twelve years the Burches have been married, Mr. Burch's service in the United States Army had forced them to move seven times. Tr. Vol. 2, p. 54. Mrs. Burch packed and unpacked all of the family household goods, even when Major Burch was serving a twelve month "hardship tour" overseas in the demilitarized zone of Korea. Tr. Vol. 2, p. 54. Mrs. Burch supported and promoted her husband's military career.[11] Tr. Vol. 2, p. 45. They loved and enjoyed their two children.

The Angela Burch of that time does not really exist anymore. Dr. Benson has observed Mrs. Burch both before and after her June 12, 2000 surgery. In the course of three years, he observed Mrs. Burch "to change from a lively, gregarious, outgoing, bubbly young lady to a woman who is much more somber and has probably aged, in my opinion, beyond three years physiologically and psychologically." Tr. Vol. 1, p. 221. Mrs. Burch, formerly the center of gravity in her family, now lives continuously with severe pain. The changes which her injuries have visited upon her as well as her husband and children have been dramatic. Tr. Vol. 2, p. 77. The changes to mind, body, and spirit that Mrs. Burch has experienced from her continued exposure to pain were not contested by the United States. Tr. Vol. 4, p. 55.

The Court finds that the overwhelming evidence presented at trial is that as a result of the surgical procedure performed on June 12, 2000, Mrs. Burch suffers from infertility, lack of natural hormone production, hot flashes, mood swings, and psychological depression. Mrs.

---

[11]Major Burch explained why his spouse's support was important for a career military officer: "It is important that your superiors see that you come from a strong team, so to speak, because when you leave, your wife is going to have to take care of your subordinate's wives, if they have any needs, as well as help up your peer's wives when you're deployed." Tr. Vol. 2, p. 45

Burch did not suffer any other occurrence or trauma that could reasonably explain the dramatic onset of those symptoms.

Under Florida law, Mrs. Burch is entitled to be awarded the amount of money that the greater weight of the evidence shows will fairly and adequately compensate her for her injuries, including such damages as Mrs. Burch is reasonably certain to incur in the future.  Florida Standard Jury Instruction 6.1a.  Mrs. Burch has a life expectancy of 45.1 years.  Major Burch has a life expectancy of 38 years.

Further, under Florida law, Major Burch is entitled to be awarded an amount of money for damages caused by the negligence of the defendant.  Major Burch will be compensated for any loss by reason of his wife's injury of her services, comfort, society and attentions in the past and in the future.

The elements of damages relative to Mrs. Burch will be first considered:

**LOSS OF THE ABILITY TO ENJOY LIFE:** After the surgery and prior to trial, Mrs. Burch suffered from depression and anxiety over her physical condition.  She  has been unable to enjoy a close, personal and physical relationship with her husband.  She is plagued with irritability, poor concentration, and mood swings as a result of fluctuating hormones, hot flashes with sweating, and pain.  She can no longer manage tasks that were formerly routine for her such as maintaining her home, going grocery shopping, taking her children to school, or doing laundry.  In addition, since the surgery,  her life has been marked by increasing stress over financial worries because of unreimbursed medical expenses, large overdue balances with her health care providers, inability to pay for necessary therapy and household help.  Mrs. Burch is virtually unable to enjoy any of the pleasures of her life before the June 2000 surgery.

In short, the rest of Mrs. Burch's life will likely be much like the last few years.  As damages for her  loss of the capacity for the enjoyment of life, past and future, the Court finds and awards as damages to Mrs. Burch the sum of **$750,000.00**.

The court recognizes that awards for pain and suffering, mental anguish and loss of enjoyment of life in the past and future are amounts, unlike amounts for future wages or medical bills, that are entirely subjective and must be determined by considering the facts of each case.  Based on the facts of this case, and a comparison to similar cases, the Court finds that the damages awarded above are reasonable.[12]

**LOSS OF EARNING CAPACITY:**  Although Major Burch testified that it was their plan that she would return to work after the children were grown, Mrs. Burch was not working in the time leading up to the surgery.  The Court concludes that an award for the loss of Mrs. Burch's earning capacity would be entirely speculative and for that reason declines to make such an award.

**MEDICAL AND RELATED EXPENSES TO DATE.**  Plaintiffs' evidence at trial regarding past medical and related expenses to date was introduced in summary fashion, without objection.  These bills and expenses for medical care through the date of trial totaled $104,204.65.  Evidence at trial was that Tricare has paid portions of those medical bills, *although the exact amount was unknown at time of trial*.  Tr. Vol. 2 at p. 90-91.  Major Burch testified that

---

[12]See, e.g. *Ravelo v. Cedars Medical Center*, et al., 97 FJVR 9-38, 1997 WL 619964 (Fla. Cir. Ct. (Jury Verdict in 1997 of $2,000,000 for past and future pain and suffering for a plaintiff, compensating her loss for having undergone a total abdominal hysterectomy instead of the removal of an ovarian cyst, negligence in the defendant's obtaining an informed consent, in the defendant's failure to offer alternative methods of treatment, and in removing healthy organs.  No aggravating factors such as irreversible, painful nerve damage were reported.)

his out-of-pocket expenses were "about $10,000.00." *Id.* at 91. The Court finds that testimony insufficient upon which to base a past medical and related expenses award. Likewise, the Court declines to award fees for travel expenses.

**FUTURE MEDICAL AND RELATED EXPENSES**[13]: The Court awards future medical expenses in an amount which will permit Angela Burch to get the medical care and services she needs, without reduction or set-off for any Tricare benefits which might otherwise be available in the future. However, the Court has only awarded future medical and related expenses which can be traced to the misdiagnosis and TAH/BSO procedure, and not the alleged negligent performance in surgical and post-surgical care.

Dr. Benson, Mrs. Burch's treating internist, and Dr. Rosin, plaintiffs' expert in the field of gynecology, testified as to the medical care Mrs. Burch would require in the future. In addition, both witnesses testified as to the anticipated cost of such care. Mrs. Burch's medical records and the medical bill summary introduced at trial provide additional evidence as to the care needed and the cost of such care. The defendant did not object to or offer any contrary evidence regarding the necessity for Mrs. Burch to receive ongoing medical care or as to the cost of such care. Based on the totality of the evidence presented including testimony, medical

---

[13]Under Florida law, awards for future damages must be reduced to present value. Florida Standard Jury Instruction 6.10. However, the Court is permitted to make a present value determination by assuming that interest and inflation will offset each other, such that the net effect is that no adjustment is made. An intentional determination that the present value is equal to future damages by application of a "total offset" calculation is permissible. See *Waxman v. Truman*, 792 So.2d 657, 659 (Fla. 4th DCA 2001), citing *Delta Air Lines Inc. V. Ageloff*, 552 So.2d 1089 (Fla. 1989), wherein the supreme court recognized such a method of calculation by which future inflation is presumed to offset any future return on a present investment. See also, *Alesse v. Baker*, 758 So.2d 1234, 1235 (Fla. 5th DCA 2000). All future damages have been reduced to present value using this method.

records and past medical bills and the reasonable inferences that can be made therefrom, this

Court finds as follows with regard to Mrs. Burch's need for future medical care and the cost of

that care in the future:

a)    Regular visits with a gynecologist at least three times per year at
      $150.00 per visit, Tr. Vol. 1, p. 159 and Tr. Vol 2, p. 22, limited to
      the 14 years of prematurely induced menopause is $6,300.00.

b)    Hormone Replacement supplements at a minimum cost of $1.25
      per day, Tr. Vol. 1, p. 128, limited to 14 years of prematurely
      induced menopause is $6,387.50.

c)    Regular lab work to monitor hormone levels.  Tr. Vol. 2, p. 23.
      Based on Mayo Clinic's charges for lab work performed twice per
      year at an average cost of $1200 per year according to the medical
      bills in evidence at PX3A, the cost of such medical care limited to
      the 14 years of prematurely induced menopause is $16,800.00.

d)    Bone density studies at an average cost of $1,003.00, Tr. Vol. 1, p.
      158.  In the past three years, Mrs. Burch has had one bone density
      test revealing osteopenia, See App. 10.  At one test every three
      years for the next 14 years, the cost is $4,751.80.

e)    Regular visits with an internal medicine specialist at least four
      times per year at $150.00 per visit, Tr. Vol. 2, p. 22, over Mrs.
      Burch's remaining lifetime is $27,060.00.

f)    Psychological therapy, Tr. Vol. 1, p. 154 and App. 11.  Based on
      Dr. Martinez's recommendations that Mrs. Burch return for
      counseling every three weeks, App. 12, (or 17 times per year) and
      at charge of $60.00 per counseling session at his office, *see* App. 9,
      the cost of this care over the course of Mrs. Burch's remaining
      lifetime is $46,002.00.

This Court finds and awards to Mrs. Burch total future damages for medical care of

**$107,300.80.**

**PAST AND FUTURE PHYSICAL PAIN AND SUFFERING:** As a result of the

defendant's negligence, Mrs. Burch has suffered the trauma of an unnecessary surgery and the

loss of her reproductive organs.  The physical pain, however, has not been shown to flow from the misdiagnosis and surgery, but rather from pain for which the root cause apparently may never be known.   Most of the pain existed prior to the misdiagnosis and surgery and continued after.  Therefore, the pain would continue without the misdiagnosis and surgery.  The evidence does not justify a conclusion that the heighten physical pain was caused by the surgery or misdiagnosis.  However, Mrs. Burch suffered pain and discomfort for a short period after the surgery which was caused by it being performed.  She suffered an infection and some pain and discomfort.  Mrs. Burch should be compensated for this pain and discomfort.  The Court finds that **$40,000.00** in damages for the physical pain attributed to the surgery is fair and reasonable and supported by the evidence.

**PAST MENTAL PAIN AND SUFFERING:**   As a result of this unwarranted surgery, Mrs. Burch lost all of her reproductive organs.  This meant that she would not be able to have more children, which she and her husband planned until being given this misdiagnosis.  At thirty-two years old, she underwent surgery and lost her ability to have any more children.  Mrs. Burch suffered side effects of surgery that included severe mood swings and irritability, which to this day artificial medication has been unable to stabilize.  Tr. Vol. 2, p. 76-77.

Within six months of surgery, Mrs. Burch was evaluated by a psychiatrist who found her to be "traumatized."  Although noted to be "compliant and pleasant", mentally she was clinically depressed due to her general medical condition.  Although anti-depressants were offered, Mrs. Burch felt unable to take advantage of them because she still had the responsibility for two small children and was reasonably concerned about  the side effects of the medication. Tr. Vol. 2, p. 106.

By January 2000, she sought mental health counseling as her "depression has reached a crescendo." App. 26. She was still tearful and having crying spells and despite her husband's support, she reported he was becoming burned out by her situation. *Id*. She was prescribed Paxil, but after two weeks noticed no improvement and the dosage was increased. *Id*. Within the context of an inpatient rehabilitation program in March 2001, she received individual and group counseling. She was discharged with a diagnosis that included major depression and generalized anxiety disorder, and was taking antidepressants (Effexor). App. 11. In the last three years, Mrs. Burch has recurrent periods of mood swings and irritability brought about by failed efforts to stabilize her hormone levels. See, i.e. App. 27 and App. 28 noting "hormone withdrawal, ex. irritability and hot flashes; and Tr. Vol. 2, p. 76-77. Unfortunately, such mental stresses seem to make her physical pain worse. Tr. Vol. 2, p. 81-82.

The Court finds and awards to Mrs. Burch as damages for past *mental* pain and suffering the amount of **$150,000.00**.

**FUTURE MENTAL PAIN AND SUFFERING:** Mrs. Burch's mental pain and suffering will continue in the future. Her life expectancy is 45.1 years. Over the course of those years, Mrs. Burch will continue to suffer the knowledge that she has not only lost the ability to bear children, but that the loss was completely unnecessary. It is not yet known whether her hormone replacement therapy will effectively eliminate the mood swings and irritability and the inability to concentrate that she continues to suffer from today. She has become increasingly dependent upon her husband for all household chores and responsibilities. Unfortunately, Major Burch will soon be required to leave for a hardship tour overseas for a period of at least one year. Despite her need for his support he will be unavailable to provide it to her. In the Court's

estimation, it is this mental pain and suffering that can be traced to the misdiagnosis and unnecessary surgery; whereas the physical pain Mrs. Burch has may or may not stem from the surgery at issue, there is no doubt in the Court's mind that her mental pain and suffering spring from the misdiagnosis and improper removal of her reproductive organs. As damages for her future mental pain and suffering, the Court finds and awards to Mrs. Burch the sum of **$500,000.00**.

**TOTAL DAMAGES/ANGELA BURCH:  $1,547,300.80**

**MAJOR BURCH'S CLAIM FOR LOSS OF CONSORTIUM, INCLUDING LOSS OF SUPPORT AND SERVICES:** Major Burch's loss of the particular support and services his wife donated to help further his career has had and will have a negative impact on his future wages and retirement benefits. Tr. Vol. 2, p. 84-5.

Since his wife's surgery, the evidence is that Major Burch has stepped in and taken over virtually all of the responsibilities and tasks his wife formerly provided. To this day, his responsibilities now include all of the household chores such as ironing, washing dishes, washing clothes, cleaning the house, cleaning the bathrooms, toilets, mopping. Tr. Vol. 2, p. 86. Major Burch testified to a loss of 92 hours per month in household services formerly provided by his wife during the 43 months prior to trial. *Id.* Testimony was also presented that the replacement cost for such services would range from $10 - $50 per hour. *Id.*

It is reasonable based on the evidence presented, to infer that Mrs. Burch is unlikely to return to her previous level of functioning and that Major Burch will either have to perform or hire someone to perform  the 92 hours of household services per month in the future. The Court recognizes and takes into account that the nature of the services may change over time,

31

considering that the couple's children will eventually move out on their own, and the 92 hours will be substantially reduced.  However, his estimate was limited to household services only and did not include child care duties.  Tr. Vol. 3, p. 86.  The evidence is uncontroverted that Major and Mrs. Burch enjoyed a close and happy marital relationship prior to her June 2000 surgery. Each was an active partner and they enjoyed their various activities together, including playing basketball, running, going on picnics and dates, raising their children, and participating in military support activities. Major Burch enjoyed his wife's attentiveness, sense of humor, and take-charge character.  Since the June 2000 surgery, the relationship Major Burch formerly enjoyed with his wife has been changed forever.  She is no longer happy, affectionate, reliable or independent.  Major Burch no longer has the benefit of being able to serve his country with the full and secure knowledge that his wife is in full control of the family's daily affairs and needs. He has not only lost the relationship he had with his wife,  he now has the added burden of providing his wife and their children with the emotional support necessary to maintain their family unit despite his wife's condition.  Based upon the evidence presented at trial, the Court awards Major Burch damages of **$500,000.00** for his loss of consortium, support and services of his wife, in the past and future.  The Court, in considering the evidence, finds this award fair and reasonable for the past and future loss of Major Burch.

<b>TOTAL DAMAGES/MAJOR BURCH:  $500,000.00</b>

**ACCORDINGLY**, it is **ORDERED**:

The Clerk is **DIRECTED** to enter a judgment in favor of the plaintiff, Angela J. Burch, in the amount of **$1,547,300.80** , and in favor of the co-plaintiff, Daniel E. Burch, in the amount

of **$500,000.00**, with costs to be assessed according to law.  Thereafter, the Court shall **CLOSE**

this case.

  **DONE AND ORDERED** in Jacksonville, Florida, this **3**ʳᵈ day of February, 2006.

                                                    **HENRY LEE ADAMS, JR.**
                                                    UNITED STATES DISTRICT JUDGE


Copies to:      Counsel of Record